SHINGLEMEYER *v.* WRIGHT.

1. APPEAL—BRIEFS—STATEMENT OF FACTS.

Under Sup. Ct. Rule No. 40, providing that the brief of an appellant shall contain a clear statement of the facts, the questions involved, and the manner in which they are raised, which statement the court will consider sufficient and accurate unless the opposite party shall point out in his brief wherein it is insufficient or inaccurate, where an appellant submits a statement in compliance with the rule, the appellee is limited to the right to point out omissions or inaccuracies therein, and he is not entitled to have considered by the court an entirely independent statement framed from his own point of view.

2. SLANDER—COMMUNICATIONS WITH POLICE OFFICERS—PRIVILEGE —MALICE.

In an action for slander, a letter written by defendant to the superintendent of police of a certain city, in which plaintiff is accused of the theft of defendant's bicycle, and statements by defendant accusing plaintiff of the theft, made to police officers connected with the detective department, are inadmissible to show malice, as they are privileged communications.

3. SAME—PUBLICATION.

An action of slander, based upon a charge of theft, cannot be maintained where the only third person to whom the charge was repeated was a police officer, whom plaintiff sent for for the express purpose of having the statement made in his presence.

4. FALSE IMPRISONMENT—EVIDENCE.

Plaintiff sought an interview with defendant at his office, where she was put under no restraint by defendant, could have left at any time, and finally did leave of her own accord, but voluntarily returned with an officer, who took her into custody, stating that, "Under the circumstances, I guess, as he [defendant] accuses you of stealing his bicycle, you will have to go to the station." It was not shown that this statement was made in the presence of defendant, nor was it shown that the arrest was made at the request of defendant. *Held,* not to constitute false imprisonment.

Error to Wayne; Lillibridge, J.  Submitted April 10, 1900.  Decided May 18, 1900.

Case by Katherina Shinglemeyer against Oliver A. Wright for slander and false imprisonment.  From a judgment for plaintiff, defendant brings error.  Reversed.

This is a suit by one Katherina Shinglemeyer against Oliver A. Wright by *capias* for an alleged slander claimed to have been uttered by defendant to one Henry, a policeman, upon the 16th of July, 1898, and for a false imprisonment which the plaintiff claims to have suffered upon the same day at the hands of the said Henry, acting under the instructions of the said defendant.

The plaintiff's testimony was to the following effect: That previous to April, 1898, she had had trouble with George Wright, a brother of the defendant, living at Columbus; that in April, 1898, she caused the said George Wright to be arrested upon a charge of bastardy, upon which charge he was put under bond, and had also sued him for breach of promise of marriage.  It is the claim of the plaintiff that, some time in the fall of 1897 or the spring of 1898, George Wright came to the place where she was working, and borrowed $22 from her, and that Oliver Wright, the defendant, was with him, and stood outside of the door.  She stated upon cross-examination that she had seen Oliver Wright only once before, and that was in Delaware, Ohio, and that she did not know Oliver Wright well enough to say whether it was Oliver Wright who called with George Wright that night or not.  Upon the 3d day of July, 1898, the plaintiff came to Detroit, where Oliver Wright resided, and upon the witness stand claimed that her purpose was to get the $22 which she claimed George Wright had borrowed for defendant's use from her at the time heretofore referred to.  She also stated that the moving cause for her coming to Detroit was to see George Wright.

Plaintiff claims she went to a boarding house on Henry

street, and remained there about three days, having arrived on Sunday; and then went to work for Mrs. Goldberg, doing general housework. The following Sunday, the 10th of July, she went to the residence of defendant, and asked for George Wright. She testified that she was informed by defendant that George Wright was not there; that she stated who she was, and that she was asked upstairs; that she asked for the money which she claimed George Wright got from her, and that Oliver Wright denied that he knew anything about it; that Oliver Wright at that time advised her to let the court settle her difficulties with his brother, but she stated that she could not wait longer, and had to have something right away. She testified further that at the time Oliver Wright told her to come up to his office in the Chamber of Commerce, and that he would talk the matter over with her; that at that time he made no threats whatsoever, and told her that, if his brother was guilty of the offense as charged by her, she could establish his guilt without question; that she had no reason to believe that Oliver Wright had any malice towards her at that time, except because Oliver seemed to think that she had not let George have any money.

Plaintiff claims that upon the 16th day of July—the Saturday following the interview with Oliver Wright at his residence—she went to his office in the Chamber of Commerce Building at about 3 o'clock in the afternoon. George Wright was in the general office, which was situated between the private office of Oliver A. Wright and the private office of R. R. Baines, both of whom used the general office in common. George Wright went from the general office into the one marked "Mr. Baines," and immediately thereafter Oliver Wright came into the office from the room into which George had gone. Plaintiff claims that Oliver Wright said, "Did you bring my wheel back?" and that she said, "I ain't got your old wheel;" and he said, "Yes, you have stolen my wheel," and said that he could prove it. At the time of this conversation

there was no one present besides plaintiff and the defendant. She also claims that he stated that he would have a warrant out for her if she did not leave his office. Thereupon she went to the telephone, and called up the central police station, and asked them to send over an officer. She stated that, if she had left the office before she had telephoned, there was no danger· of her having been arrested, or a warrant, or anything of that sort, but that she was not going to have him stand there saying that she was a thief, and that she had made up her mind that she was going to make him prove it. After she called up the central police station, she waited for the police to come over for a long while, and made no effort to leave the office. No policeman appearing, she called up the police station a second time, and told them again to send over a policeman. She claimed that Mr. Wright was present when she telephoned the second time, and that she could have left the office at that time if she had desired. The officer did not come the second time she called, so she waited half an hour, and called up the police station a third time, and told them to send over an officer. The plaintiff claimed that, at some time after she had called up the police station the first time, she tried to get out of the office, but could not do so. She at first said it was after she had telephoned the second time. Again, she testified that she called up the second time because she wanted the police to hurry up, and she did not know whether she was locked up at that time or not; that, at one time while she was in the office, the police department called up Mr. Wright's office, and Mr. Wright answered the telephone; that while he was at the telephone she could have left the office if she had wanted to, and that she stayed because she wanted to. Finally, she stated that she did not try to leave the office until she had called up the last time.

"*Q.* As a matter of fact, you did not try to get out before the second time [you telephoned]?

"*A.* I don't believe I did.

"*Q.* You are certain of that?

"*A.* Yes, I am certain.

"*Q.* As a matter of fact, you did not call up the police department the second time because you could not get out?

"*A.* No, I think that the reason I called up the second time, or the third time, was because I wanted them to hurry."

After she had called up the police station the third time, and no officer had come, she left the office without any interference upon the part of the defendant, went down the elevator, and near the door met the policeman Henry. She testified that there was nothing to prevent her going to the Goldbergs', or any other place, at that time. Instead of that, she brought the policeman back to Mr. Wright's office, and herself stated to the policeman that Mr. Wright accused her of stealing his wheel, and that she wanted to see whether he could do so. The policeman went into Mr. Wright's private office, and said something which the plaintiff did not hear; and witness testified that there was nothing to prevent her leaving the office at that time if she had wanted to. She also testified that Mr. Wright stated that she did steal the wheel, and that he (Mr. Wright) wanted her to be taken over and locked up. She testified that the policeman told her that she had to go along with him. There is no evidence in the case that Mr. Wright was present when any such thing was said to the plaintiff, if it was said. The plaintiff testified that she went over to the police station with the officer, and was asked a few questions there, and then was taken down by two detectives to the Brush-Street Depot, to be identified; that the baggageman at the Lake Shore station said she was not the woman who had checked a man's wheel to Toledo on the evening of the 10th, and that the detectives then put her on the car, and she went home.

Upon the following day the plaintiff testifies that she went up to the defendant's residence, with a rubber hose, and that she was going to thrash him; that she did not start to thrash Oliver, but did start to thrash George; that

she commenced to thrash him without saying a word, and George took the rubber hose away from her, without using any more force than was necessary. Plaintiff testified that she on that day (Sunday) told Oliver Wright that he had accused her of stealing his wheel, and that she was going to make it mighty hot for him some time. She testified that Oliver Wright told her that if she would go to Columbus he would fix everything all right, and that they would come for her that night, and that they did so. She testified that they came up to see her that same evening, and that she agreed to go to Columbus the next morning; that she went down to the station the next morning, but did not have the money to pay her fare; that neither the defendant nor his brother had the money to give her to buy a railroad ticket, and that she thereupon went back to the defendant's office, where he gave her four dollars, and stated that he would loan it to her, and she gave a receipt for it as a loan; that she left that afternoon for Columbus, and stayed there just one week.

Plaintiff claimed that at one time defendant had called her "a crazy old thing," but when that was, or in whose presence it was uttered, she did not know. Plaintiff testified, when asked when she had first made up her mind to sue the defendant, that she told her attorney the 2d of January, 1899, that she wanted to get it started before she went home; that she had thought of it all along, but that she was not ready. She was then asked the question when she had first made up her mind to begin the suit, and she answered, "I had it in my mind all the time." Subsequently she was asked whether she intended to bring this suit before the 1st of October, 1898, to which she replied, "I meant to sue him from the first time." After the occurrences which we have narrated fully, witness testified that she told several people that she was Oliver Wright's sister-in-law; that she had a child 3 years old; that she had a suit in Cleveland, where she was suing her husband for divorce; and that none of the statements were true.

Thomas Henry, the officer who it was claimed by plaintiff was the person to whom the alleged slander had been uttered, and who was the person who made the alleged arrest complained of, testified that on the 16th of July he was sent over to the Chamber of Commerce Building, and met the plaintiff in the lobby of that building; that she spoke to him first, and told him that Mr. Wright accused her of stealing his wheel, and had locked her in his office; that he persuaded her to go upstairs with him, but did not compel her to go; that when he entered the office he asked what the trouble was; that Mr. Wright said: "This girl is coming around here, and raising a disturbance, and trying to make trouble for my brother. From what I can learn, she is a loose woman, and not the kind of a woman the police want in Detroit." Witness testified that Miss Shinglemeyer was the first person who said that she had been accused of stealing the wheel. Witness testified that the plaintiff said first, "He accuses me of stealing his bicycle, and says I am a thief, and I am going to make him prove it." Witness also testified that the defendant said Detectives High and Larkins were looking for her, and that he (defendant) had learned that a woman had checked a man's wheel from Detroit to Toledo by the Lake Shore baggageman. Witness, although pressed by leading questions, did not testify that the defendant asked him to arrest the plaintiff. He testified further that he walked with the plaintiff over to the central station, and turned her over to Detectives High and Larkins.

Detectives High and Larkins were called as witnesses for the plaintiff. They testified, under objection and exception, that they had called over to the defendant's office on the morning of the 11th of July; that the defendant told them that he had had his wheel stolen, and suspected some woman with whom his brother had trouble in Columbus; that he did not know her name, but that he could find it out, and let them know. They testified further that they went over to his office again upon the 16th, in

response to a telephone message, and that he told them that he knew who the party was who stole his wheel; that her name was Kitty Shinglemeyer, and that she lived on South Fourth street, in Columbus, Ohio, with her brother; that he was positive she stole the wheel, as he had the description of a woman answering her description, who checked the wheel over the Lake Shore to Toledo; that he had written a letter to the chief of police of Columbus; that the defendant had said that he did not know how the officers felt about a woman of that character, but that she was not the kind of a woman that he thought the police department wanted, and that she was a bad woman; that plaintiff was brought down to the station in the afternoon of the 16th of July, in the custody of the policeman Henry; that they took her in charge; took her down to the Lake Shore baggage-room, and that the night baggageman, after seeing her, said she was not the party that checked the wheel. The defendant was called to the stand by the plaintiff, and testified that he had written a letter to the chief of police of Columbus. The letter, and the testimony of witnesses High and Larkins, were admitted by the court under objection and exception that they were privileged, and were not counted upon in the declaration. The letter reads as follows:

"DETROIT, MICHIGAN, July 16, 1898.
"SUPERINTENDENT OF POLICE,
"Columbus, Ohio.
"*Dear Sir:* A day or two ago I wrote you concerning my bicycle, which was taken from my residence last Sunday evening. I stated that I suspected a party whose home is in Columbus, Ohio, of having committed the theft. My suspicions are now confirmed. We have been able to trace the wheel to the Lake Shore Depot, where it was checked last Sunday night to Toledo. It left Detroit about 9:40. The woman whom I suspect is Kittie Shinglemeyer. She probably rechecked the wheel for Columbus. We have been able to trace it thus far from the unusual circumstance of a woman checking a gentleman's wheel. I cannot learn on what road she left Toledo, but you might be able to get some information

which would be of use to you in finding the wheel at either the Union Depot or the Ohio Central Depot at Columbus. Miss Shinglemeyer has a brother living, I think, on South Fourth street, Columbus. If I am not mistaken, she makes her home with her brother. I shall probably be in Columbus Monday to look after the matter personally. If in the meantime you are able to recover the wheel, I shall be very glad to reward the one to whom such reward would be due."

The testimony of the defendant and his witnesses was upon all material questions diametrically opposed to that of the plaintiff.

*Selling & Hatch*, for appellant.

*Frank C. Cook* and *R. E. Van Syckle*, for appellee.

LONG, J. (*after stating the facts*). 1. The above statement of facts is taken from appellant's brief. It is a full compliance with Sup. Ct. Rule No. 40, with references to the record to support the statements. Counsel for appellee concede the correctness of the statement, but they say:

"As several items contained in the record do not appear in the statement in appellant's brief, and are necessary to a full understanding of the questions raised, we desire to submit this short statement of facts."

Five pages of their brief are then occupied with a statement. This is not a compliance with the rule, which reads as follows:

"The brief of a party bringing a cause into this court shall contain a clear and concise statement of the facts of the case, distinct from the argument, and of the errors upon which he relies, the questions involved, and the manner in which they are raised. The court will consider such statement sufficient and accurate, unless the opposite party shall point out in his brief wherein the statement is insufficient or inaccurate."

Counsel for appellee cannot make a statement of facts from their point of view, and leave this court to examine the record and both statements, and determine which is

correct. Under this rule it is the duty of the appellee to point out what essential statements are omitted, and to state them as an addition to appellant's statement, with references to the record. We must, therefore, take the statement made by appellant's counsel as correct. The references given by them to the record fully sustain it.

2. The court was in error in admitting the above letter and the statements made by defendant to the two detectives High and Larkins in regard to the larceny of his wheel. These were privileged communications. They were introduced and admitted for the purpose of showing malice. The trial judge was in doubt as to their competency, but finally admitted them. Privileged communications cannot be used for that purpose. Defendant's property was stolen, and it was not only his privilege and right, but his duty, to give to the detectives, who, in this case, were specially appointed for the purpose, all information he had, and, if he had suspicions of any person, to state who the person was, and the reasons for suspecting him. Such communications are made in the strictest confidence, and are as sacred, in the eye of the law, as the communications between client and lawyer, or patient and physician. To be evidence of malice, these communications must in themselves have been malicious, and would, therefore, form the basis themselves for an action for slander. If this be the law, no person would be safe from prosecution in communicating to police officers, whose duty it is to examine into the case and hunt for the criminal, his suspicions, or statements which might tend to implicate a person. Public policy forbids the adoption of such a rule. These detectives were under legal, as well as moral, obligations to keep these communications secret. They were not made for publication, and the officers had no right to divulge them to others. It is very doubtful if these detectives could be compelled to disclose in court such privileged communications. Such officers, especially in large cities, are entitled to know from the citizen against whom a crime has been committed all his suspicions and knowledge,

both in regard to the person suspected, and also in regard to his character and habits. The defendant did not make these statements for repetition. He made them for the exclusive use and benefit of the trusted and sworn officers of the law. They should have been forever locked in their breasts, and never disclosed; otherwise, few persons would dare to disclose to an officer the name of a suspect, or anything they had learned about his character.

3. In regard to the statement by defendant in the presence of the officer Henry, it was not a publication for which the law gives a remedy. She herself solicited the statement, and sent for the officer for the express purpose of having the defendant repeat the statement in his presence. It would not have been stated to him except by her invitation. She might have left the defendant's office. She waited some time for the officer to come, and then left, and, meeting the officer as she emerged from the building, came back with him for no other purpose than to ask him to repeat the statement in his presence. In *Cristman* v. *Cristman*, 36 Ill. App. 567, plaintiff was suspected of an assault with intent to murder. The defendant suspected the plaintiff, and so stated to an officer. Plaintiff took one King with him, and went to defendant's house. King asked her, in the presence of plaintiff, if she had any idea who did it, to which defendant replied: "There is only two mean enough to do it, and Johnnie is one of them. Johnnie is the only one that would do it, and he is the one that did do it." Held that plaintiff could not recover.

Where one received a letter containing libelous statements, and himself read the letter to others, held that he could not recover. *Sylvis* v. *Miller*, 96 Tenn. 94 (33 S. W. 921). There is no difference in principle between reading a letter to another and soliciting a person to make a similar verbal statement.

Where one sought from the superintendent of a railroad company a letter of recommendation for his friend, which letter was given, containing a statement that the person

had left the service of the company during a strike, held that this was not publishing a libel. *Kansas City, etc., R. Co.* v. *Delaney,* 102 Tenn. 289 (52 S. W. 151, 45 L. R. A. 600). The following cases sustain the same doctrine: *Irish-American Bank* v. *Bader,* 59 Minn. 329 (61 N. W. 328); *Heller* v. *Howard,* 11 Ill. App. 554; *Fonville* v. *McNease,* 1 Dud. (S. C.) 303; *King* v. *Waring,* 5 Esp. 13; *Smith* v. *Wood,* 3 Camp. 323; *Haynes* v. *Leland,* 29 Me. 233.

Plaintiff repeatedly testified that she sent for the policeman to see if she did steal his wheel, and that she was going to make him prove it. The maxim, "*Volenti non fit injuria*," applies.

4. Plaintiff was put under no restraint in the defendant's office by him prior to the arrival of the officer. She sought the interview, could have left at any time, and finally did leave of her own accord, and voluntarily returned with the officer. She is the sole witness to testify that the defendant said he wanted her locked up. The officer does not testify that defendant said he wanted her arrested, and defendant expressly denies it. Whatever restraint the officer placed upon her, if any, is not shown to have been at the request of the defendant. The officer testified that he said to her:

"'Under the circumstances, I guess, as he accuses you of stealing his bicycle, you will have to go to the station.' At first she said she would not go, and I said, 'You better go easily, because he accuses you of stealing his bicycle.'"

Whether this was said in the presence of defendant does not appear. She then went to the station with the officer, where she met the detectives High and Larkins, and went with them to the depot to see if she could be identified as the woman who checked a wheel to Toledo. The person checking the wheel failed to identify her, and she then went to her residence.

Under the uncontradicted testimony, the defendant could not be held liable for false imprisonment. If plain-

tiff was illegally restrained of her liberty, the officer alone is responsible for it. He was there at her request, and was acting for her, and not for defendant.

Judgment reversed, and no new trial ordered.

The other Justices concurred.