*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RYAN GUZALL,

Plaintiff-Appellant,

v

MICHIGAN STATE UNIVERSITY, MICHIGAN
STATE UNIVERSITY BOARD OF TRUSTEES,
and KATHERINE A. FRANZ,

Defendants-Appellees.

UNPUBLISHED
September 29, 2022

No. 356768
Court of Claims
LC No. 20-000189-MK

Before: K. F. KELLY, P.J., and LETICA and RICK, JJ.

PER CURIAM.

Plaintiff appeals as of right the opinion and order of the Court of Claims granting summary disposition in favor of defendants, Michigan State University (MSU), the MSU Board of Trustees,[1] and Katherine A. Franz, and denying plaintiff's motion for leave to amend the complaint. We affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

This matter arises from plaintiff's role as an independent contractor for an entity named The Axia Institute (Axia) from February 2019 to June 2019. At the time, Axia was an MSU-affiliated research and education center that worked closely with MSU's supply-chain department and third-party contractors. Franz was the executive director for Axia and worked in Midland, Michigan. Plaintiff graduated from MSU and held advisory and independent contractor roles with MSU-affiliated entities before he became involved with Axia.

In early 2019, Axia had an opening for a full-time business development director. Plaintiff alleged that, on January 30, 2019, Franz met with him at the Midland Country Club and offered him the full-time business development director position, with terms including a "$135,000 annual

---

[1] MSU and the MSU Board of Trustees will be collectively referred to as the "MSU Defendants."

-1-

salary, 10% matching, and University benefits." In the meantime, Axia hired plaintiff to serve as the interim business development director to assist with the transition. According to plaintiff, he agreed to the interim position because he believed he would eventually transition into the full-time role.

Plaintiff and Axia agreed to a written interim statement of work (SOW). The interim SOW covered the 19-week period from February 18, 2019 to June 28, 2019. The SOW stated that the interim projects would be completed within 760 hours, at a rate of $90 per hour, for 40-hour work weeks. The total estimated payment was $68,400. The SOW explained, "Ryan Guzall will be considered an independent contractor for taxation and insurance purposes under this agreement." Plaintiff was prohibited from exceeding the estimated 760 billable hours without "approval by the client." Axia would pay plaintiff $3,600 per week on a biweekly, "NET 30" schedule and would make any additional payments, such as reimbursement of travel expenses, within two weeks after the project was completed or canceled. Axia could cancel the project at any time.

According to plaintiff, in March 2019, he became concerned that Franz was creating a hostile work environment at Axia. He also raised concerns to Franz about intellectual property ownership of certain "deliverables" created by Axia's contractors. In late April 2019, despite his claim that he was already hired for the role, plaintiff submitted an application for the full-time business development director position. Axia interviewed plaintiff in May 2019. Plaintiff asserted that, around the same time, Franz requested that plaintiff sign a "Standard Terms and Conditions" document and a "Confidential Disclosure Agreement One-Way."

Plaintiff submitted several invoices to MSU from February 24, 2019 to July 3, 2019, but he completed the 760 hours of work identified in the SOW by May 31, 2019. Yet he continued to perform work into June 2019. On June 4, 2019, Franz and plaintiff met in Franz's office to discuss whether to extend plaintiff's interim role through the end of July 2019. According to Franz, she told plaintiff that Axia's search for a business development director was ongoing, and she did not expect to have the position filled before July 2019. She claimed that plaintiff then became upset upon realizing that he was not going to fill the full-time role, slammed his laptop on her desk, and stated, " '[Y]ou'll regret this.' "

On June 5, 2019, Franz told plaintiff that she would like to renew his interim contract and requested a new SOW. In response, plaintiff stated, "I will return a proposal by end-of-business today." Plaintiff did not work in the office on June 5, 2019, or June 6, 2019. On June 6, 2019, Axia's administrative assistant e-mailed plaintiff a modified draft amended SOW. Plaintiff responded, "I cannot accept those terms, as that is an employment contract, and the timeframe does not work for me." However, plaintiff said he would sign the "original agreement" without the modifications. He noted that he would not attend upcoming Axia meetings if the original agreement was not accepted. Franz then asked plaintiff to clarify what he was referring to in his e-mail. In his e-mail response, on the same day, plaintiff stated, "Unfortunately, the window for the contract to be approved has passed. Good luck with your search." Thus, on June 6, 2019, plaintiff retrieved his personal belongings from the office.

On June 24, 2019, Franz reported to the Midland Police Department that plaintiff was harassing Axia's business associates. She told the police that plaintiff "became irrational, formed anger issues and started to harass other employees." Franz felt threatened by plaintiff because he

-2-

was unpredictable. On June 26, 2019, Franz e-mailed Christopher Winter, then a principal of Spartan Consulting, Inc., an Axia business affiliate. In this "Winter E-mail," she informed Winter that plaintiff had displayed "unpredictable outbursts of anger," became agitated during a meeting, and stated, " '[Y]ou will regret this.' " Franz stated that plaintiff was misrepresenting that he was affiliated with MSU. Indeed, ultimately the university sent plaintiff a cease-and-desist letter and closed plaintiff's MSU e-mail account. In contrast, plaintiff reached out to various stakeholders, including Axia board members and clients, raising concerns about Franz and the Axia environment. Plaintiff learned of the Winter E-mail and claimed that it caused him to lose business opportunities.

Plaintiff submitted a notice of intent and complaint in the Court of Claims. Plaintiff raised claims for (1) breach of contract regarding the SOW contracts, (2) breach of contract with regard to the alleged promise of full-time employment, (3) tortious interference with business relationships, (4) libel, (5) slander, (6) abuse of process, (7) quantum meruit, (8) unjust enrichment, (9) intentional infliction of emotional distress (IIED), (10) negligent misrepresentation, (11) specific performance, and (12) vicarious liability with regard to the MSU Defendants. In lieu of filing answers to the complaint, defendants moved for summary disposition. In response, plaintiff opposed the dispositive motions and attempted to amend the complaint to add new factual and legal claims. The Court of Claims issued an opinion and order granting defendants' motions for summary disposition in their entirety and denying plaintiff's motion for leave to amend the complaint because the amendment would be futile.[2] It also denied plaintiff's motion for relief and reconsideration.

## II. GOVERNMENTAL IMMUNITY

Plaintiff alleges that the Court of Claims erred by concluding that plaintiff's tort claims against the MSU Defendants were barred by governmental immunity. We disagree.

The appellate court reviews de novo the lower court's decision on a motion for summary disposition. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). We also review de novo whether governmental immunity applies in a particular case. *Pike v Northern Mich Univ*, 327 Mich App 683, 690; 935 NW2d 86 (2019). Summary disposition under MCR 2.116(C)(7) is warranted if the claim is barred by immunity granted by law. *Id.* " 'The

---

[2] In their brief on appeal, the MSU Defendants challenge this Court's jurisdiction on the basis that plaintiff untimely filed his motion for reconsideration. We disagree. MCR 7.204(A)(1)(d) allows for an appeal of right to be filed within 21 days after entry of "an order deciding a post-judgment motion for new trial, rehearing, reconsideration, or other relief from the order or judgment appealed, if the motion was filed within the initial 21-day appeal period or within any further time that the trial court has allowed for good cause during that 21-day period." Plaintiff timely moved for reconsideration on February 18, 2021, but the motion was rejected because it was over the required page limit. The Court of Claims allowed plaintiff to refile his motion for reconsideration, which he did on February 25, 2021. The court denied the motion for reconsideration on March 18, 2021, on the merits, and plaintiff filed a timely claim of appeal on April 1, 2021. We have jurisdiction to consider this appeal.

-3-

contents of the complaint must be accepted as true unless contradicted by the documentary evidence.' " *Id*. (citation omitted). The documentary evidence is viewed in the light most favorable to the nonmovant. *Id*. "If there is no factual dispute, a trial court must determine whether summary disposition is appropriate under MCR 2.116(C)(7) as a matter of law." *Id*. at 690-691.

The governmental tort liability act (GTLA), MCL 691.1401 *et seq*., protects a governmental agency from tort liability if the agency "is engaged in the exercise or discharge of a governmental function." MCL 691.1407(1). A public university or college falls under the definition of a governmental agency. *Pike*, 327 Mich App at 691, citing MCL 691.1401(a) and (g). The plaintiff is responsible to plead facts to avoid application of governmental immunity. *Kendricks v Rehfield*, 270 Mich App 679, 681; 716 NW2d 623 (2006). If an entity qualifies as a "governmental agency" as set forth in MCL 691.1407(1), it is presumed to be immune from tort liability unless a plaintiff can demonstrate that his claims fall under an exception to immunity. *Lash v Traverse City*, 479 Mich 180, 195; 735 NW2d 628 (2007). There are six exceptions to immunity, known as the highway exception, MCL 691.1402; the motor-vehicle exception, MCL 691.1405; the public-building exception, MCL 691.1406; the government hospital exception, MCL 691.1407(4); the proprietary function exception, MCL 691.1413; and the sewage system exception, MCL 691.1417. *Lash*, 479 Mich at 195 n 33.

The Court of Claims concluded that plaintiff's complaint failed to address governmental immunity or plead any exceptions to governmental immunity. Accordingly, it dismissed plaintiff's tort claims against the MSU Defendants, even to the extent the claims allegedly arose from vicarious liability.

Plaintiff submits that the MSU Defendants must be vicariously liable for Franz's alleged misconduct, or, alternatively, the MSU Defendants are directly liable because they were not carrying out a governmental function. Addressing the vicarious liability claim, plaintiff relies on the Michigan Supreme Court's decision in *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567; 363 NW2d 641 (1984), superseded by statute on other grounds as stated in *Ray v Swager*, 501 Mich 52, 81; 903 NW2d 366 (2017) (recognizing that the GTLA was amended after the *Ross* decision to create a narrow exception to qualified immunity for government actors). The *Ross* Court recognized that there are certain circumstances in which a government agency can be held vicariously liable for the torts of its employees, officers, or agents. *Id*. at 621. The Court explained:

> Allegations of vicarious tort liability generally arise where an employment relationship exists between the governmental agency and the individual tortfeasor. *Respondeat superior* liability generally can be imposed only where the individual tortfeasor acted during the course of his or her employment and within the scope of his or her authority. [*Id*. at 623-624.]

However, our Supreme Court clarified that the government agency is not automatically liable in each instance that its agent commits a tort. *Id*. at 624-625. Rather, "[a] governmental agency can be held vicariously liable only when its officer, employee, or agent, acting during the course of employment and within the scope of authority, commits a tort while engaged in an activity which is nongovernmental or proprietary, or which falls within a statutory exception." *Id*. at 625. In contrast, if the agent is carrying out a governmental function, the agency is entitled to immunity.

*Id.* Thus, to overcome governmental immunity for tort claims, the plaintiff must "(1) plead a tort that falls within one of the GTLA's stated exceptions, or (2) demonstrate that the alleged tort occurred outside the exercise or discharge of a governmental function." *Genesee Co Drain Comm'r v Genesee Co*, 309 Mich App 317, 327; 869 NW2d 635 (2015).

Plaintiff alleges that because Franz was acting in the scope of her employment with Axia at the time of the alleged tortious conduct, the MSU Defendants are vicariously liable for her conduct. However, even assuming Franz was acting in the course and scope of her employment when she reported plaintiff's conduct to the police and to Winter, plaintiff failed to establish that Franz was engaged in a nongovernmental function, or that her conduct fell within a statutory exception. See *Ross*, 420 Mich at 624-625. Plaintiff did not plead any facts to avoid application of governmental immunity, and the Court of Claims correctly dismissed the claims under MCR 2.116(C)(7).

Even if facts in avoidance of immunity were pleaded, the MSU Defendants were entitled to governmental immunity. With regard to plaintiff's assertion that Franz was not carrying out a governmental function, MCL 691.1401(b) defines the phrase "governmental function" to mean "an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." The proprietary function exception to government immunity, MCL 691.1413 provides:

> The immunity of the governmental agency shall not apply to actions to recover for bodily injury or property damage arising out of the performance of a proprietary function as defined in this section. Proprietary function shall mean any activity which is conducted primarily for the purpose of producing a pecuniary profit for the governmental agency, excluding, however, any activity normally supported by taxes or fees. No action shall be brought against the governmental agency for injury or property damage arising out of the operation of proprietary function, except for injury or loss suffered on or after July 1, 1965.

"[T]o be a proprietary function, an activity: '(1) must be conducted primarily for the purpose of producing a pecuniary profit; and (2) it cannot be normally supported by taxes and fees.' " *Herman v Detroit*, 261 Mich App 141, 145; 680 NW2d 71 (2004) (citation omitted).

Plaintiff cites MSU's mission statement, as codified in MCL 390.101, to support his claim that Axia's activities were not expressly or impliedly mandated by law. In relevant part, MCL 390.101 provides:

> The state educational institution at East Lansing shall hereafter be known by the name of "Michigan state university". Michigan state university shall provide the inhabitants of this state with the means of acquiring a thorough knowledge of agriculture and all its allied branches, of mechanic arts, of domestic art, of domestic science, of military tactics and of military engineering, and to this end it shall afford such instruction in science, art and literature as, in the judgment of its governing body, will promote the object of the institution.

Plaintiff does not analyze, in his brief on appeal, whether Axia's activities were conducted for the purpose of producing a pecuniary profit or whether its activities were normally supported by taxes and fees. Nevertheless, we conclude that Axia's business activities were designed to carry out MSU's mission statement. Plaintiff alleged that Axia is a research and education center that worked closely with MSU's Supply Chain Department and external contractors. Axia was the "premier research and education center dedicated to developing effective and sustainable solutions to improve public and private value chains." In fact, Axia was founded through a collaboration of various MSU colleges, including the Broad College of Business. Although plaintiff alleges that Axia was privately funded by the Dow Chemical Company and other Dow-affiliated entities, he presents no legal basis for why that fact would be dispositive. Instead, Axia's goal was to advance research and education, which is in accord with the MSU Defendants' purpose, as outlined in MCL 390.101.

Nor does plaintiff present a compelling argument that Axia was engaged in a proprietary function. Axia's stated purpose, according to the complaint, was to engage in research and education—not to produce a pecuniary profit for MSU. Plaintiff also failed to allege in his complaint (or provide evidence) that Axia was not performing activities normally supported by taxes or fees. For these reasons, the MSU Defendants were entitled to government immunity protection against plaintiff's vicarious liability claims.

Regarding direct liability, plaintiff did not raise any direct liability claims against the MSU Defendants in the Court of Claims. Instead, plaintiff's claims (tortious interference, IIED, defamation, abuse of process, and negligent misrepresentation) related to Franz's alleged misconduct. On appeal, plaintiff contends that he could have amended his complaint to allege a direct liability claim against the MSU Defendants on the basis that Axia performed functions outside of cognizable governmental functions. He cites to an affidavit of professor Amy Broglin-Peterson, in which she asserted that MSU faculty members were conducting independent work for Axia in excess of MSU's guidelines for outside work.[3] According to plaintiff, Axia was receiving private funding, which establishes that MSU was not performing a governmental function.

However, as discussed earlier, plaintiff failed to plead any facts (or provide any evidentiary support) for his claim that Axia was engaged in an extragovernmental activity or any form of proprietary activity. Furthermore, plaintiff did not allege that the MSU Defendants engaged in any tortious conduct in relation to Axia that caused plaintiff any damages. Rather, his claims pertained to Franz's conduct. For these reasons, even if plaintiff had pleaded a direct liability

---

[3] Moreover, documentary evidence submitted by a party that consists of mere conclusory allegations that are devoid of detail are insufficient to create a genuine issue of material fact. *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 3134 (1996). "The affidavits must be made on the basis of personal knowledge and must set forth with particularity such facts as would be admissible as evidence to establish or deny the grounds stated in the motion." *SSC Assocs Ltd Partnership v General Retirement Sys*, 192 Mich App 360, 364; 480 NW2d 275 (1991). The affidavits by plaintiff do not state with particularity that they are made through personal knowledge but generally state that an individual was "made aware" of facts, seemingly indicating that the information was acquired through hearsay.

claim against the MSU Defendants, that claim would have failed as a matter of law. The court properly dismissed plaintiff's tort claims against the MSU Defendants under MCR 2.116(C)(7).

## III. BREACH OF CONTRACT

Plaintiff next contends the Court of Claims improperly determined that his contractual claims against the MSU Defendants were time-barred. We note at the outset that plaintiff's brief mischaracterizes the Court of Claims' decision. The Court of Claims concluded that plaintiff's breach of contract and specific performance claims regarding the alleged offer of full-time employment was time-barred, but dismissed the breach of contract claim regarding the unpaid SOW invoices on the merits. We disagree with plaintiff that any of his contract claims should have survived summary disposition.

The Court of Claims dismissed plaintiff's claims for breach of contract relating to the alleged promise for full-time employment and the claim for specific performance under MCR 2.116(C)(7) (statute of limitations). Summary disposition is proper under MCR 2.116(C)(7) when the claim is barred by the applicable statute of limitations. *Sabbagh v Hamilton Psychological Servs, PLC*, 329 Mich App 324, 335; 941 NW2d 685 (2019). The court must accept all well-pleaded factual allegations as true and construe them in the light most favorable to the nonmoving party. *Id*. at 335-336. However, the court must consider all of the documentary evidence submitted by the parties as well, in the light most favorable to the nonmovant. *Id*. at 336. In other words, " 'a court considers the affidavits, pleadings, and other documentary evidence presented by the parties and accepts the plaintiff's well-pleaded allegations as true, except those contradicted by documentary evidence.' " *Everson v Williams*, 328 Mich App 383, 388; 937 NW2d 697 (2019). We review de novo questions of statutory interpretation, including whether MCL 600.6431 requires dismissal of certain claims for failure to provide the required notice. *Mays v Snyder*, 323 Mich App 1, 24-25; 916 NW2d 227 (2018), aff'd 506 Mich 157; 954 NW2d 139 (2020). The Court of Claims dismissed plaintiff's breach of contract claim relating to the unpaid invoices under MCR 2.116(C)(10). Summary disposition is proper under MCR 2.116(C)(10) when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Ass'n of Home Help Care Agencies v Dep't of Health and Human Servs*, 334 Mich App 674, 684 n 4; 965 NW2d 707 (2020). A motion premised on (C)(10) tests the factual support for a party's claim and is granted "if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact." *Id*. (citation and quotation marks omitted). A genuine issue of material fact exists if the record, after giving the benefit of reasonable doubt to the nonmovant, leaves an issue open on which reasonable minds may differ. *Id*. We review de novo issues relating to the proper interpretation of a contract. *Rory v Continental Ins Co*, 473 Mich 457, 464; 703 NW2d 23 (2005).

MCL 600.6431 outlines the conditions precedent to filing a claim against the state in the Court of Claims. *Fairley v Dep't of Corrections*, 497 Mich 290, 297; 871 NW2d 129 (2015). MCL 600.6431(1) provides:

> Except as otherwise provided in this section, a claim may not be maintained against this state unless the claimant, within 1 year after the claim has accrued, files in the office of the clerk of the court of claims either a written claim or a written

notice of intention to file a claim against this state or any of its departments, commissions, boards, institutions, arms, or agencies.

A claim under § 6431 accrues when " 'the wrong upon which the claim is based was done.' " *Mays*, 323 Mich App at 14. The word "wrong" is defined to mean "the date on which the defendant's breach harmed the plaintiff, as opposed to the date on which defendant breached his duty." *Id*. (citation and quotation marks omitted). In other words, each element of the cause of action, including damages, must exist. *Id*. at 14-15. Similarly, a breach of contract claim accrues, for purposes of the statute of limitations, " 'at the time the wrong upon which the claim is based was done regardless of the time when damage results.' " *Scherer v Hellstrom*, 270 Mich App 458, 463; 716 NW2d 307 (2006), quoting MCL 600.5827.

Plaintiff's claim for breach of the alleged promise of future employment accrued on June 6, 2019—the date plaintiff's relationship with Axia ended. On June 6, 2019, plaintiff told Franz that "the window for the contract to be approved has passed. Good luck with your search." Plaintiff acknowledged, in his complaint, that his last day of work for Axia and MSU was June 6, 2019. Accordingly, by June 6, 2019, plaintiff knew that his full-time employment "would not come into being" and that the MSU Defendants would not fulfill their alleged promise. Plaintiff's damages of lost business opportunity had already accrued by June 6, 2019.

Plaintiff asserts that the dispositive date is the date on which the MSU Defendants failed to pay his outstanding invoices under the SOW or July 9, 2019. But this date has no bearing on when plaintiff's claim for breach of the promise of full-time employment accrued. Instead, that date would be relevant to when plaintiff's breach of contract claim for failure to pay under the SOW accrued. The correct accrual date with regard to the alleged breach of the full-time employment promise was June 6, 2019. The MSU Defendants did not dispute that plaintiff was entitled to an additional 102 days of tolling because of the COVID-19 pandemic. Executive Order No. 2020-122; Administrative Order No. 2020-18, 505 Mich lxxxviii (2020). As a result, plaintiff was required to file his notice of intent by September 16, 2020. See MCR 1.108(3). Plaintiff untimely filed his notice of intent on September 22, 2020. Therefore, the court correctly dismissed plaintiff's breach of contract and specific performance claims relating to the alleged promise for full-time employment.

Next, plaintiff challenges the court's decision regarding his breach of contract claim for unpaid invoices under the SOW. The Court of Claims concluded that the SOW did not require the MSU Defendants to pay for an unapproved invoices. We agree.

To establish breach of contract, a plaintiff must prove "(1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 178; 848 NW2d 95 (2014). When interpreting a contract, the court will first look at the plain language of the agreement. *Harbor Park Market, Inc v Gronda*, 277 Mich App 126, 130; 743 NW2d 585 (2007). "If no reasonable person could dispute the meaning of ordinary and plain contract language, the Court must accept and enforce the language as written, unless the contract is contrary to law or public policy." *Id*.

The plain language of the SOW is clear and unambiguous. The SOW provided that plaintiff would work "40-hours per week." The SOW stated that "project time estimate" was 760 hours.

The SOW then stated that plaintiff would work for 19 weeks, at 40 hours per week, at a rate of $90 per hour. The total project estimate was $68,400. Finally, the SOW provided, "Ryan Guzall will not exceed the billable hours in the in the [sic] estimate without approval by the client." The parties attempted to negotiate a new SOW, but never finalized their agreement. Therefore, under the plain and unambiguous contract language, plaintiff could not bill more than 40 hours per week without preapproval. Plaintiff does not challenge that the MSU Defendants paid his invoices up to the 760-hour total. Rather, he claims Franz periodically permitted him to work more than 40 hours per week, which justified his invoices above the 760-hour limit. But plaintiff did not present any evidence to support his claim that Franz approved the two unpaid invoices. Furthermore, as plaintiff acknowledges in his brief on appeal, he told Franz he would *not* charge MSU beyond the project estimate. Plaintiff agreed that, "Billing will remain at 760 hours, and $3,600 per week, per agreement until $68,400 total is reached. *Client will not be billed for additional hours already worked*." (Emphasis added.) The Court of Claims properly dismissed the breach of contract claim relating to the SOW under MCR 2.116(C)(10).

Plaintiff also does not allege, in his brief on appeal, that the court erred by dismissing his quasi-contract claims (or his contractual claims against Franz). Nor does he raise the issues in his statement of the questions presented. Therefore, he has abandoned those arguments on appeal. *Berger v Berger*, 277 Mich App 700, 712; 747 NW2d 336 (2008) ("A party abandons a claim when it fails to make a meaningful argument in support of its position."); *Ypsilanti Fire Marshal v Kircher*, 273 Mich App 496, 543; 730 NW2d 481 (2007), citing MCR 7.212(C)(5).

## IV. TORT CLAIMS AGAINST FRANZ

Plaintiff contends that Franz was not entitled to the application of privilege with regard to plaintiff's tort claims because she knew that plaintiff did not commit a crime. Furthermore, plaintiff argues that there was a genuine issue of fact regarding whether Franz acted with actual malice. We disagree on both accounts.

The Court of Claims dismissed plaintiff's defamation claims under MCR 2.116(C)(8) and (C)(10). A motion under MCR 2.116(C)(8) tests the legal sufficiency of the plaintiff's complaint. *Ass'n of Home Help Care Agencies*, 334 Mich App at 684 n 4. Summary disposition is proper if the plaintiff has failed to state a claim on which relief may be granted. *Id*. The court may only consider the pleadings in the complaint, but all factual allegations are accepted as true. *Id*. " 'The motion should be granted if no factual development could possibly justify recovery.' " *Id*. (citation omitted). The application of privilege is a question of law that we review de novo. *Eddington v Torrez*, 311 Mich App 198, 199-200; 874 NW2d 394 (2015).

Plaintiff's complaint pleaded claims for libel and slander. We agree with the Court of Claims that this Court has incorporated both libel and slander into the overarching umbrella of "defamation." See *Redmond v Heller*, 332 Mich App 415, 432-433; 957 NW2d 357 (2020). " 'A communication is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.' " *Reighard v ESPN, Inc*, ___ Mich App ___, ___; ___ NW2d ___ (Docket No 355053); slip op at 5, citing 3 Restatement Torts, 2d, § 559, p 156. The elements of a defamation claim include

(1) a false and defamatory statement concerning the plaintiff, (2) an *unprivileged* communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. [*Reighard*, ___ Mich App at ___; slip op at 5 (citation and quotation marks omitted; emphasis added).]

Certain statements will be considered absolutely privileged from defamation claims. *Oesterle v Wallace*, 272 Mich App 260, 264; 725 NW2d 470 (2006). " 'An absolutely privileged communication is one for which no remedy is provided for damages in a defamation action because of the occasion on which the communication is made.' " *Id*. (citation omitted). This is because public policy requires that an individual be free from liability for publishing what may otherwise be considered defamatory. *Id*. If the statement is absolutely privileged, it is not actionable (even if it was malicious). *Id*.

The seminal case regarding absolute privilege for police reports is *Eddington*, 311 Mich App 198. In *Eddington*, this Court affirmed the trial court's decision to grant the defendant's MCR 2.116(C)(8) motion for summary disposition based on the plaintiff's claim that the defendant had falsely reported that the plaintiff had stolen gasoline on four separate occasions. *Id*. at 199. This Court, relying on *Shinglemeyer v Wright*, 124 Mich 230; 82 NW 887 (1900), held, "[P]ersons who make statements to the police when reporting crimes or assisting the police in investigating crimes enjoy a privilege in those statements against the police divulging them for any purpose other than law enforcement." *Eddington*, 311 Mich App at 201. So the statements could not support a defamation claim. *Id*. This Court declined to entertain the plaintiff's challenge to the absolute privilege in the context of police reports, noting that public policy supported the resolution. *Id*. at 202 ("[W]e could not reliably have practical law enforcement if crime victims, or those with knowledge of crimes, were forced to risk a lawsuit upon reporting what they know or what they suffered."). Furthermore, this Court noted that individuals could be dissuaded from making an untrue statement to the police because making a false police report is a crime under MCL 750.411a. *Id*. Citing the absolute privilege created by the *Shinglemeyer* decision, this Court therefore affirmed the trial court's decision without requiring factual development on the truth of the matter asserted in the police report. See *id*. at 203.

Plaintiff contends that *Eddington* does not apply in this case because the crime Franz reported to the police never occurred. However, this Court held in *Eddington* that the defendant's statements to the police were absolutely privileged, regardless of whether they were true or whether the defendant acted with malice. See *id*. at 202-203. Accordingly, Franz's police report was absolutely privileged and could not give rise to an actionable defamation claim.

With regard to the Winter E-mail, the Court of Claims concluded that Franz was entitled to qualified privilege, and plaintiff was required to establish actual malice. This Court has recognized a qualified privilege for discussions between individuals on matters of " 'shared interest' " *Rosenboom v Vanek*, 182 Mich App 113, 116-117; 451 NW2d 520 (1989). The privilege "extends to all bona fide communications concerning any subject matter in which a party has an interest or a duty owed to a person sharing a corresponding interest or duty." *Id*. at 117. This includes not only legal duties, but also moral or social duties. *Id*. "The elements of a qualified privilege are (1) good faith, (2) an interest to be upheld, (3) a statement limited in its scope to this

purpose, (4) a proper occasion, and (5) publication in a proper manner and to proper parties only." *Prysak v RL Polk Co*, 193 Mich App 1, 15; 483 NW2d 629 (1992). "A plaintiff may overcome a qualified privilege only by showing that the statement was made with actual malice, i.e., with knowledge of its falsity or reckless disregard of the truth." *Id*. The plaintiff must plead actual malice with specificity. *Id*.

In *Rosenboom*, this Court concluded that the defendant, a University of Michigan student, was protected by qualified privilege against the plaintiff's defamation claim based on the defendant's disclosure to a faculty department chair that the plaintiff, a member of the same faculty department, had sexually assaulted her. *Rosenboom*, 182 Mich App at 117-118. This Court concluded that the defendant's reports were bona fide statements made between parties sharing a mutual interest in encouraging the report of sexual assaults. *Id*. at 118.

We note that plaintiff does not challenge whether the shared-interest privilege applies to the Winter E-mail. Rather, he contends that his complaint adequately alleged actual malice to overcome qualified immunity. In the complaint, plaintiff alleged that Franz was motivated to eliminate his position because of his internal whistleblowing activities. In his response to Franz's motion for summary disposition, plaintiff asserted additional facts to support his malice claim. In short, plaintiff submitted that because Franz continued to work with plaintiff after the June 4, 2019 incident in her office, she acted with actual malice. But the fact that Franz continued to interact with plaintiff for business purposes after the alleged incident is not relevant to whether she made false statements or acted with reckless disregard for the truth.

On appeal, plaintiff relies on two affidavits, from Axia intern Zachary Nelson and Broglin-Peterson, to support his malice argument. Nelson's and Broglin-Peterson's affidavits were *not* attached to the response to Franz's motion for summary disposition. Rather, plaintiff attached the affidavits to his motion for relief for judgment and argued that they contained newly discovered evidence. Even if plaintiff had attached the affidavits to his response brief, Nelson's and Broglin-Peterson's affidavits do not create an issue of fact regarding actual malice.

Nelson stated that he did not hear plaintiff make any loud noises or tell Franz " 'you're going to regret this.' " Plaintiff claims that he could not obtain Nelson's affidavit in time to attach it to his response brief because Franz had placed a "gag order" on the Axia staff. But plaintiff included Nelson in his initial disclosures and indicated Nelson would have information regarding plaintiff's behavior during the June 4, 2019 altercation, as well as the alleged gag order. And by his own admission, Nelson would not have heard the conversation between plaintiff and Franz. He explained, "I was able to overhear conversations, but not specific words and content, which took place in Katherine Franz's office from my desk at the Axia Institute." So even if the event had occurred, Nelson would not have witnessed it.

Similarly, plaintiff included Broglin-Peterson as a witness on his initial disclosures. He indicated Broglin-Peterson would have information regarding plaintiff's behavior while working with Axia, Franz's full-time employment offer and "internal discussions regarding Katherine Franz's professional behavior." Plaintiff obtained another affidavit from Broglin-Peterson in early September 2020, which referred to the same March 30, 2020 meeting. Therefore, plaintiff was aware before his case was dismissed that Broglin-Peterson had information about Franz's alleged misconduct while serving as executive director for Axia.

Broglin-Peterson's statements do not give rise to a question of fact regarding whether Franz acted with malice. In her more recent affidavit, Broglin-Peterson detailed a meeting in which she and other MSU officials discussed Franz's behavior while serving as Axia's executive director. Broglin-Peterson stated that she discussed with other MSU officials why plaintiff's contract ended and suggested that Franz's e-mail was "slanderous and accusatory." Even if Broglin-Peterson's affidavit is accepted as true, it is irrelevant to whether Franz acted with malice. The meeting took place on March 30, 2020—nearly nine months after the encounter between plaintiff and Franz and Franz's alleged malicious statements. Broglin-Peterson's affidavit does not provide any support for plaintiff's claim that Franz made a false statement, or that she acted with intent or reckless disregard. She does not state the factual basis for her claim that Franz's statements were false or inaccurate. The Court of Claims therefore properly dismissed plaintiff's defamation claims because both claims were barred by privilege.

Plaintiff does not raise a specific argument regarding his tortious interference claim in his brief on appeal. Therefore, his argument is abandoned on appeal. See *Berger*, 277 Mich App at 712. Similarly, although plaintiff vaguely refers to the abuse of process claim in his brief on appeal, plaintiff does not raise a specific argument regarding the abuse of process claim. This argument is also abandoned on appeal. See *id*. Plaintiff does not raise any challenge whatsoever to the court's decision regarding his IIED and negligent misrepresentation claims. So these claims are also abandoned on appeal. See *id*.

## V. AMENDMENT OF COMPLAINT

Plaintiff next argues that the court abused its discretion by denying his motion for leave to amend the complaint to include additional factual background and legal claims. We disagree.

This Court reviews a lower court's denial of a motion for leave to amend a complaint for an abuse of discretion. *Sanders v Perfecting Church*, 303 Mich App 1, 9; 840 NW2d 401 (2013). An abuse of discretion occurs when the result falls outside of the range of reasonable and principled outcomes. *Kalaj v Khan*, 295 Mich App 420, 425; 820 NW2d 223 (2012). The court should freely allow a plaintiff to amend the complaint when justice so requires. *Sanders*, 303 Mich App at 9. But the court need not grant a motion to amend the complaint if the amendment would be futile. *Id*. "An amendment would be futile if it is legally insufficient on its face, and the addition of allegations that merely restate those allegations already made is futile." *Wormsbacher v Phillip R Seaver Title Co*, 284 Mich App 1, 8-9; 772 NW2d 827 (2009).

Plaintiff's amended complaint contained the same claims alleged in the original complaint. As discussed earlier, Broglin-Peterson's second affidavit did not change the outcome with regard to plaintiff's defamation claims. Nelson's new affidavit also did not alter the outcome of plaintiff's tort claims. More specifically, the amended complaint did not overcome the privilege defenses to the defamation and tortious interference claims. As noted earlier, the MSU Defendants were entitled to governmental immunity with regard to plaintiff's tort and vicarious liability claims. Similarly, plaintiff failed to plead any new factual claims or legal theories to avoid dismissal of his breach of contract claims. For these reasons, the Court of Claims correctly concluded that the proposed amendment was futile.

The amended complaint also added claims for declaratory judgment, due-process violation, retaliation for exercising First Amendment rights, wrongful discharge, and public-policy discharge, all against the MSU Defendants. Plaintiff does not raise an argument, on appeal, that the Court of Claims erred by concluding that the new claims in the amended complaint lacked merit. He has therefore abandoned those issues on appeal. See *Berger*, 277 Mich App at 712. For these reasons, the Court of Claims did not abuse its discretion by denying the motion for leave to amend the complaint.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Anica Letica
/s/ Michelle M. Rick